**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

---

UNITED FOOD AND COMMERICAL WORKERS INTERNATIONAL
UNION, LOCAL 7, AFL-CIO

       Plaintiffs,

v.

DILLON COMPANIES, LLC d/b/a KING SOOPERS,

       Defendant.

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

COMES NOW United Food and Commercial Workers International Union, AFL-CIO, Local 7 (collectively, the "Plaintiff" or "Local 7"), by and through undersigned counsel, respectfully moves for a preliminary injunction pending pursuant to Fed. R. Civ. P. 65(a) as more fully set forth herein.

## OVERVIEW AND FACTUAL BACKGROUND

This action arises out of a series of collective bargaining agreements (the "CBAs") entered into between Plaintiff and Defendant Dillon Companies, LLC d/b/a King Soopers (hereinafter "Defendant" or "King Soopers"). Pursuant to the terms of the CBAs,[1] the bargaining

---

[1] Local 7 represents the vast majority of the employees in the Defendant's represented stores, but the employees in a given store are typically divided into a "retail" unit and a "meat" unit. The meat unit is generally comprised of employees in the Meat/Seafood and Deli Departments, and where applicable, the Cheese and Starbucks kiosks. Kim C. Cordova Declaration at ¶ 3. Generally, the remaining employees are included in a "retail" bargaining unit, which

unit workers represented by Local 7 have the exclusive right to perform work "connected with the handling or selling of merchandise" within the stores, with certain exceptions discussed herein. In or around November of 2021, Plaintiff first became aware that King Soopers was utilizing third-party staffing services to provide employees performing bargaining unit work.

Bargaining unit members and Local 7 staff have discovered that at least two different entities, Retail Odyssey and Day Ready/People Ready, whose workers were in the stores performing bargaining unit work. Although these entities apparently provide what is, at times, permissible services (according to King Soopers representatives, Day Ready/People Ready provide sanitation and floor maintenance services[2] within the stores and Retail Odyssey performs store resets[3]), they were instead observed stocking the shelves (in one case, a frozen case), which is exclusively bargaining unit work.

The collective bargaining agreement covering retail clerk workers provides:

**ARTICLE 2**
**BARGAINING UNIT WORK JURISDICTION**

**Section 2.** All work and services performed in the bargaining unit connected with the handling or selling of merchandise to the public shall be performed exclusively by bargaining unit members except as provided below. Store Managers, Assistant Managers, Field Merchandisers can perform all duties in the store. Delicatessen, Coffee, and Cheese Clerks, and the department managers (Deli Manager, Assistant Deli Manager, Coffee Lead, and Cheese Steward} can perform all work in the bakery.

---

includes employees working in the checkstands, pharmacy, produce, dairy, and other departments not included in the meat unit. Cordova Declaration at ¶ 3. *See also* Complaint at ¶¶ 15, 16. Bargaining units are comprised of the respective employees across a store or stores in a given geographical area. *See* Exhibit 1 at Arts. 1, Exhibit 2 at Arts. 2; *see also* Complaint at ¶¶ 14-16. The retail and meat agreements contain nearly identical language restricting vendor work in the stores. *See supra* and Exhibit 1 at Art. 2, Exhibit 2 at Art. 2.

[2] Sanitation and Floor maintenance work is specifically permitted to be outsourced by the CBAs. Exhibit 1 at Article 2; Exhibit 2 at Article 2.

[3] The CBAs also permit up to three store "resets" per year to be performed by direct store vendors. Exhibit 1 at Article 2; Exhibit 2 at Article 2. A "reset" involves moving numerous products normally placed for sale in one area of the store to another area of the store, and otherwise shuffling the respective placement of a multitude of products within the store. *See* Cordova Declaration at ¶ 7.

Bargaining Note: Bakery Clerks shall remain in the Clerks Pension.

## **AUTHORIZED WORK FOR VENDORS**

**Section 3.** **Vendor Work:** Direct store vendors who deliver the product categories of beverages (including juice sold in produce/deli departments), cookies and crackers, bakery, pizza, ice cream, chips, specialty/gourmet/natural foods, greeting cards (and related products such as bows, wraps, candles, balloons, ribbons), newspapers, magazines, books and related products shall be allowed to perform all work in connection with the sale of their products directly delivered to the store. For purpose of this provision, the product categories as used herein shall be interpreted to include all products delivered by such vendor. Additionally, all vendors shall be allowed to stock and otherwise maintain any J-Hook or Clip strip program. Additionally, all vendors may perform: any work in connection with promotional and seasonal displays; facing in connection with the service of product; rotation of product; cleaning of product, shelves and racks; affixing coupons and other promotional materials ta products; vendors shall be permitted to perform three (3) major resets per store per section per calendar year. Additionally, vendors may perform work, as necessary to accommodate the introduction of new items, or removal of discontinued items, from the set; checking of code dates and removal of outdated product; and any work in connection with the opening of a new store and the two (2) week period thereafter, or during the two (2) weeks before and after a store remodel.

**Section 4.** **Work Jurisdiction.** Except for sanitation and floor maintenance, the Employer agrees not to subcontract operations existing within the stores. The Employer agrees that no employee classified as a Sanitation Clerk or Sanitation Manager on May 11, 1996 shall be laid-off or reduced in hours as a result of the subcontracting of floor care or expansion of Courtesy Clerk duties. However, the Employer reserves the right to promote Sanitation Clerks and/or Managers to All Purpose Clerk vacancies in order to provide for the use of outside contractors for floor maintenance and sanitation work. It is understood that before a full-time Sanitation Clerk is advanced to a full-time All Purpose Clerk position, such employee must have more seniority than the most senior employee on the All-Purpose Clerk full-time list for the vacancy. It is understood that Sanitation Clerks protected herein may be assigned hours in lower classifications, at their sanitation rate, for purpose of meeting the job security provision of this section.

Subcontracting is defined as a contractual relationship with another employer whereby employees of that employer perform the work of bargaining unit employees. A purchase order is not a subcontracting agreement.

The collective bargaining agreement covering meat bargaining unit workers provides:

## ARTICLE 2
## SERVICE IN MEAT-DELICATESSEN DEPARTMENTS, PLANTS

**Section 2.** All work performed in the meat, delicatessen and seafood department(s) will be done by members of the bargaining unit, except Store Managers, Assistant Store Managers, and Field Merchandisers may perform all duties in the meat department without restriction. Bakery Clerks and the department managers (Bakery Manager and Assistant Bakery Manager) can perform all work in the Delicatessen, Coffee, and Cheese Departments. For the purpose of this agreement, the meat department is defined as the area occupied by the meat storage rooms, the meat preparation rooms and the service and/or self-service display cases where fresh, smoked, cooked and frozen meats, poultry, fish and seafood are offered for retail sale, with the exception of poultry products, the pricing of all meat products shall be done on the premises except as provided herein. Notwithstanding, the Employer may have specialized sanitation work, such as cleaning of ceiling tiles, grease traps, drains, walls, etc., performed by personnel outside the bargaining unit.

**Bargaining Note:** Bakery Clerks are not permitted to work in the Meat and Seafood/Butcher Block.

**Section 2 A.** Bargaining unit employees shall perform the work of cutting or preparation of meats that are cut, processed or prepared on the Employer's premises for immediate consumption.

All fresh, cured, smoked or frozen meat, refrigerated luncheon meats, fish, poultry and rabbits shall be handled by employees within the bargaining unit. Nothing in this agreement shall be construed to prevent non-bargaining unit employees from selecting customer purchases from the sales floor throughout the entire store, including the storage and retrieval thereof.

No one other than employees covered by this agreement shall be permitted to perform the cutting or preparation of meat in the meat departments, meat markets, seafood or delicatessen departments on the employer's premises, except as set forth below:

1) This does not include the transaction of the checkstand.

2) No representative of management above the level of head meat cutter (except for owners, partners and/or officers of the Employers) shall perform the work customarily assigned to employees in the bargaining unit except: (a) when a bargaining unit employee who has been scheduled to work fails

to report to work as scheduled; (b) in connection with the instruction or training of an employee or employees; or (c) in connection with the first thirty days of the opening of a new or remodeled market; or (d) in connection with simple straightening of display cases; or (e) in connection with the removal of outdated, distressed or damaged merchandise from display cases; or (f) in connection with floor maintenance work performed by a member of the retail clerks bargaining unit in connection with work related to the meat, delicatessen and seafood departments; or (g) in response to a specific customer request.

**Section 2 B.** **Vendor Work.** Direct store vendors who deliver the product categories of beverages (including juice sold in produce/deli departments), cookies and crackers, bakery, pizza, ice cream, specialty/gourmet/natural foods and chips, shall be allowed to perform all work in connection with the sale of their products directly delivered to the store. For purposes of this provision, the product categories as used herein shall be interpreted to include all products delivered by such vendor. Additionally, all vendors shall be allowed to stock and otherwise maintain any J-Hook or Clip strip program. Additionally, all vendors may perform: any work in connection with promotional and seasonal displays; facing in connection with the service of product; rotation of product; cleaning of product, shelves and racks; affixing coupons and other promotional materials to products; vendors shall be permitted to perform three (3) major resets per store, per section, per calendar year. Additionally, vendors may perform work, as necessary to accommodate the introduction of new items, or removal of discontinued items, from the set; checking of code dates and removal of out-dated product; and any work in connection with the opening of a new store and the two (2) week period hereafter, or during the two (2) weeks before and after a store remodel.

**Section 2 C.** A Journeyman Meat Cutter shall be on duty in each store a minimum of eight (8) hours per calendar day. Hours scheduled in the classifications of Head Meat Cutter and 1st Cutter may be used to satisfy this obligation. The Employer agrees not to layoff a Journeyman Meat cutter hired and assigned to a retail store position on or before March 5, 2005 as the direct result of this section.

**Section 2 D.** Retail Clerks may assist in meat department cleanup work, provided such assignments do not conflict with applicable child labor and/or health and safety regulations.

**Section 3.** It is understood that the cutting or preparation of meats that are cut, processed or prepared on the Employer's premises for immediate human consumption will continue to be performed in the market located on the Employer's premises, unless the Employer transfers said work, in which case the following paragraph will be applicable: If the Employer transfers the cutting and fabricating of retail cuts of fresh meats performed in its retail store or stores covered by this

agreement to a location or locations outside of said retail store or stores, the Employer will continue to recognize the Union as the bargaining agent for the meat cutters, apprentices and wrappers employed by the Employer in the cutting and fabricating of retail cuts of fresh meat, and the seniority rights provided in this agreement shall continue to apply throughout the bargaining unit, including said new location or locations of the Employer.

**Section 3 A.** Notwithstanding anything contained herein to the contrary, the Employer shall not be restricted in, or prohibited from, obtaining and offering for sale fresh, smoked, cured, cooked and frozen meats, poultry, fish or seafood which have been cut, prepared, processed, packaged, weighed and/or priced off the Employer's premises and it is expressly understood and agreed that such shall not constitute a violation of this agreement. Notwithstanding the preceding sentence, the Employer agrees that no head meat cutter, first cutter, journeyman meat cutter or apprentice meat cutter assigned to one of the aforementioned classifications by the Employer on or before May 11, 1996 shall be laid off or reduced in scheduled hours. The Employer shall have the right to transfer and/or schedule meat cutters in more than one (1) store within the bargaining unit and/or adjacent bargaining unit (s) as may be necessary to fulfill this obligation, except that the Employer shall not schedule such employees for split shifts.

The Employer shall continue to have the right to layoff employees in accordance with the provisions of this agreement, provided that the layoff of any meat wrapper, butcher block, seafood clerk or delicatessen clerk assigned to such classification on or before May 11, 1996, is for reasons other than the Employers utilization of the products set forth in Section 3A above. It is understood and agreed that in meeting the job guarantees contained herein the Employer shall have the right to assign any higher classified employee to perform work in a lower classification.

In the event of a store closure, or plant closure, resulting in the layoff of any head meat cutter, first cutter, journeyman meat cutter, apprentice meat cutter or meat wrapper, such affected employee (s) shall be permitted to exercise his seniority to displace the least senior meat cutter or meat wrapper in the involved bargaining unit as provided for herein, or, at the affected employee's discretion, the least senior meat cutter or meat wrapper in the State of Colorado. Such least senior meat cutter or meat wrapper affected by the exercise of the most senior meat cutter's or meat wrapper's seniority shall be laid-off. It is understood that in applying this provision meat cutters may displace only meat cutters and meat wrappers may displace only meat wrappers.

**Section 4.** In the event of the closure of the King Soopers Meat Plant, meat cutters and meat wrappers assigned to the Retail Cut Line on the date of closure who elect to receive severance, as provided for in this agreement, in lieu of

6

exercising their seniority rights contained in this agreement shall be paid a severance supplemental payment equal to fifty percent (50%) of the severance amount such employee is eligible to receive under the store and plant closing provision of this agreement. It is understood and agreed that in the event a retail cut line meat cutter or meat wrapper covered under this provision elects to bump into a store, the affected store employee subject to layoff shall be eligible for the plant closing severance pay as provided herein. For all other plant classifications impacted by a plant closure, the Employer agrees to discuss with the Union the effects of such decision.

**Section 5.** No employee shall be required to maintain restrooms.

Exhibit 2 at Art. 2.

The parties' agreements provide three categories of exceptions to the exclusivity of bargaining unit work:

- The specific King Soopers' positions of "Store Managers, Assistant Store Managers, and Field Merchandisers" can perform bargaining unit work in the stores. Exhibit 1 at Article 2. (Specific individuals permitted to perform the work):

"Store Managers, Assistant Managers, Field Merchandisers can perform all duties in the store." Exhibit 1 at Article 2.

- "Sanitation and Floor Maintenance" work may be subcontracted. Exhibit 1 at Article 2. (Specific work which can be subcontracted):

"Except for sanitation and floor maintenance, the Employer agrees not to subcontract operations existing within the stores." Exhibit 1 at Article 2.

- "Direct store vendors" who deliver certain enumerated products can be utilized to perform certain types of work. *Id*. "Direct store vendors" means a vendor that delivers a product in an enumerated category directly to the store, as opposed to products that

come in from King Soopers' warehouse (Limitation on both specific individuals and the work they may perform).

Except as provided for in these three exceptions, all stocking work within the store is bargaining unit work. Declaration of Kim Cordova ("Cordova Declaration") at ¶¶ 4-6.

The parties are presently in the process of bargaining for new agreements to replace the current agreements set to expire on January 8, 2022. For months, King Soopers has admitted to Local 7 that the wages it is paying to workers is inadequate to attract and retain workers. Cordova Declaration at ¶ 24. Prior to the incidents discussed herein, King Soopers offered to raise wages, but only for certain geographic areas and limited to new hires – which would have resulted in a raise for approximately 25% of bargaining unit workers but which would leave the remaining 75% of bargaining unit workers with nothing. *Id*. at ¶ 28. Although Local 7 made a counterproposal for wage increases for all bargaining unit workers while the parties negotiate successor collective bargaining agreements, King Soopers rejected the proposal. *Id*.  Instead of negotiating further with the Union, Defendant instead chose to deal with its inability to hire by unlawfully outsourcing work in violation of the CBAs. *Id*.

In late November 2021, Local 7 learned that third parties were performing bargaining unit work in some of Defendant's stores in the Denver and Colorado Springs bargaining units. Cordova Declaration at ¶ 9. Specifically, that third parties were performing bargaining unit work, including, but not limited to stocking, facing, and handling merchandise, in a manner which is prohibited by the CBAs. *Id*.

For example, on December 3, 2021, union representative Tyson Kehm personally observed workers who identified themselves as employees of Retail Odyssey. Declaration of

Tyson Kehm ("Kehm Declaration") at ¶¶ 4-8. These employees were observed stocking products in refrigerated and/or freezer cases at King Soopers store 100. *Id*. In another instance, union representative Jennifer Streifel received a report from workers about Retail Odyssey workers in the store from a bargaining unit employee who works at the store. Upon filing a grievance with the store manager, the manager admitted that the Retail Odyssey employee had been performing regular duties of bargaining unit night crew workers all week. Declaration of Jennifer Streifel ("Streifel Declaration") at ¶¶ 4-6. In yet another instance, workers at Store 82 observed and photographed four Day Ready workers performing bargaining unit work such as stocking.

The third parties performing bargaining unit work are not direct store vendors. *See, e.g.*, Cordova Decl. at ¶ 19; Kehm Declaration at ¶ 10; Streifel Declaration at ¶ 4.  In each of these cases, the Union has filed a grievance over these issues, and the Company has denied the grievance. The above-referenced grievances are just some of the examples of bargaining unit work performed by third parties including Retail Odyssey and Day Ready, but are emblematic of the larger disregard for bargaining unit work protections demonstrated by King Soopers.

Local 7 confronted Defendant with information it had learned about the staffing services' workers, and some of the documentary evidence it had gathered, including photographs and timesheets provided by the third-party workers reflecting that, contrary to the assurances of King Soopers' leadership, the work being performed was the unpacking of pallets sent from King Soopers' warehouse (known in workplace jargon as "throwing the load"). Streifel Declaration at ¶ 4. In the face of these confrontations, some of Defendant's representatives shifted their explanations, and Defendant began providing inconsistent information to Local 7. Athar Bilgrami, Human Resources Leader told Local 7 President Kim Cordova that the workers were

only performing sanitation and floor maintenance services and that they were not stocking, despite photographic evidence to the contrary. Cordova Declaration at ¶ 16. Kroger Vice President of Labor Relations Leroy Westmoreland promised that any improper work would cease, although it did not cease. *Id.* at ¶ 12. Meanwhile Raymond Deeny, King Soopers' attorney, wrote that these workers were performing a "reset," despite the fact that the work was not being performed by a "direct store vendor." Id at ¶ 22.

Disputes between the Parties are subject to a mandatory grievance and arbitration procedure. *See* Exhibit 1 at Art. 43; Exhibit 2 at Art. 48. Plaintiff filed at least four (4) separate grievances concerning the CBA violations. *See* Exhibits 3-6;  Kehm Declaration ¶ 13; Streifel Declaration ¶ 7. Pursuant to the terms of the parties' agreements, these grievances are subject to mandatory arbitration.

In addition to verbal discussions, Local 7 made a number of requests that King Soopers provide written assurances that it would cease and desist from using these third-party entities to perform bargaining unit work and provide several categories of information relevant to the grievances. Cordova Declaration at ¶ 13.  Among these requests are a letter from Local 7 President Cordova to King Soopers' President Joe Kelly and a letter from Local 7 General Counsel Mathew Shechter to King Soopers' attorney Raymond Deeny. *See* Exhibits 7, 9.  King Soopers ignored Local 7's information requests[4] set forth in these communications and failed to provide any written assurances that the conduct would cease – indeed, King Soopers instead denied the violations – at least in writing. Exhibits 8, 10.

---

[4] The failure to respond to the information requests is presently before the National Labor Relations Board in an unfair labor practice proceeding, NLRB case number pending.

Although this matter is subject to a mandatory grievance and arbitration procedure under the parties' CBAs, disputes between the parties typically take a year or more to reach an arbitration hearing. *See* Cordova Declaration at ¶ 27. These CBA violations are often extremely difficult for the Union to identify, as a third-party worker may be in the store for perfectly legitimate reasons one day and performing bargaining unit work the next. *Id*. Moreover, third-party workers for some direct-delivery vendors may be permitted to stock certain items on the shelves directly, while an employee of a third-party staffing service or even a different vendor, is not permitted to stock the same exact product. *Id*. at ¶ 4-8.  Vendors are not always readily identifiable or distinguishable from one another. *Id*. at ¶ 19. The difficulty in identifying violations is compounded by the Defendant's refusal to provide information about the third-party workers in the stores and their activities. *Id*. at ¶¶ 14-15.

## LEGAL STANDARD

The Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 (1976) generally prohibits federal courts from issuing injunctions in labor disputes. However, the Supreme Court recognized that an employer in a federal court action brought pursuant to § 301 (a) of Labor Management Relations Act (LMRA) could secure an injunction against a strike if the collective bargaining agreement between the parties contained a no-strike provision and if the strike involved a grievance that the parties agreed to submit to arbitration. *See Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235 (1970). The Supreme Court narrowed this exception further in *Buffalo Forge Co. v. United Steelworkers*, by allowing court to enjoin strikes only if the dispute underlying it is subject to the arbitration provision of the contract. 428 U.S. 397 (1976).

However, this Court has the jurisdiction to issue an injunction, as this falls under the one

of the exceptions that have been carved out. The line of cases following *Boys Market* and *Buffalo*

*Forge*, do not limit the court from only enjoining strikes but allow Court to enjoin actions to

maintain the status quo.  In fact, the Tenth Circuit held "that Boys Market injunctions are

available to enjoin employer breaches of collective bargaining agreements which threaten the

arbitral process." Amoco 885 F.2d at 702.  *Oil, Chemical and Atomic Workers International*

*Union, AFL-CIO, Local 2-286 v. Amoco Oil Co*., 885 F.2d 697, 703 (10th Cir. 1989).

The right of federal courts to issue injunctions like that sought here is well established.

*See Machinists Local Lodge 1266 v. Panoramic Corp*., 668 F.2d 276, 279 (7th Cir. 1981)

(Federal courts have the authority, in aid of arbitration, to enjoin employer actions.); *Lever*

*Brothers Co. v. International Chemical Workers, Local 217*:

> An injunction to preserve the status quo pending arbitration may be issued either
> against a company or against a union in an appropriate in an appropriate Boys
> Markets case where it is necessary to prevent conduct by the party enjoined from
> rendering the arbitral process a hollow formality in those instances, where, as here,
> the arbitral award when rendered could not return the parties substantially to the
> *status quo ante*.

554 F.2d 115, 123 (4th Cir. 1976).

The Tenth Circuit articulated a a six-factor test in *Oil, Chemical and Atomic Workers*

*International Union, AFL-CIO, Local 2-286 v. Amoco Oil Co.*, to assess whether it should issue a

preliminary injunction to maintain the status quo in a labor dispute. 885 F.2d 697 (10th Cir.

1989). The moving party must show: (1) the dispute is subject to mandatory arbitration under the

labor contract; (2) that the arbitrable dispute is the underlying dispute and not a collateral one;

(3) the moving party will suffer irreparable injury without such an injunction; (4) the balance of

hardship favors it; (5) that is has a probability of success on the merits, and (6) that the injunction

is in the public interest. *Id. See also Dillon Co. v. Food and Commercial Workers Local 7*, Civil

Action No. 09-cv-01364-PAB-BNB., 2009 BL 138962, at *7-8 (D. Colo. June 23, 2009).

## ARGUMENT

Plaintiff can satisfy all six elements of the Tenth Circuit test for a preliminary injunction.

Accordingly, this Court should grant injunctive relief to maintain the status quo pending

arbitration.

**I.     The Dispute is Subject to Mandatory Arbitration Under the Parties' Collective Bargaining Agreement**

The party seeking an injunction must first show that the dispute is subject to mandatory

arbitration under the parties' contract. *Amoco*, 885 F.2d at 703. Here, it is indisputable that issues

concerning the scope or performance of bargaining unit work are subject to mandatory

arbitration under the parties' collective bargaining agreement. As articulated *supra*, the CBAs

contain provisions detailing the scope of bargaining unit and prohibitions on third parties

performing such work. The CBAs likewise contain broad provisions outlining the disputes

subject to the grievance and arbitration procedure:

> Should ***any*** dispute or complaint arise over the interpretation or application of this Agreement, there shall be an earnest effort on the part of the parties to settle such promptly through the following steps . . .

Exhibit 1 at Art. 43; Exhibit 2 at Art. 48 (emphasis added). The CBAs then detail the procedure

leading to arbitration.

- First, the parties hold a Step 1 meeting, essentially an informal conversation among the parties concerning the disputed issue.

- If the parties fail to resolve the dispute at Step 1, it proceeds to Step 2, where the Union reduces it to writing and the parties hold another meeting.

- If the grievance is not resolved at Step 2, either party may request arbitration, and "the other party *shall be obligated* to proceed with arbitration" following the process outlined in the CBAs.

Exhibit 1 at Art. 43; Exhibit 2 at Art. 48 (emphasis added).

The dispute here, which concerns the interpretation and application of bargaining unit work outlined in Article 2 of the CBAs, clearly falls within the matters subject to the parties' mandatory arbitration procedure.

Accordingly, Local 7 has, in accordance with this procedure, filed grievances against Defendant for the same violations outlined above, *see* Exhibits 3-6 (as well as countless other grievances alleging improper use of third parties to perform exclusive bargaining unit work, some of which have proceeded to arbitration).

## II.     The Arbitrable Dispute is the Underlying Dispute and is Not Collateral

The same question is presented in the grievances and this arbitration – namely, whether the whether the work currently being performed by third parties in Defendant's stores is permissible under the contract. Thus, the arbitrable dispute is the underlying dispute, and is not collateral to the issues before this Court. *See Dillon Co*., 2009 BL 138962, at *8 (the dispute before the court is not collateral where the same question is presented in the pending grievances subject to arbitration as is presented in the lawsuit).

## III.    Plaintiff Will Continue to Suffer Irreparable Injury Without an Injunction

Next**,** a Plaintiff seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Market* must show that they are suffering and will continue to suffer irreparable injury, which in in this context requires "an injury that would undermine the integrity

of the arbitration integrity of arbitration process by making the reward only an 'empty victory.'"
*Amoco*, 885 F.2d at 704 (citations omitted); *see Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 285 (7th Cir. 1981).

If not enjoined, any arbitral award will be at best an impartial remedy because Defendant's conduct will be a *fait accompli* by the time the parties hold an arbitration hearing. The bargaining unit work will have been performed, with the non-bargaining unit persons paid for the hours spent performing such work. The work cannot be created and re-performed by the bargaining unit.

Additionally, because Defendant is using third parties to avoid negotiating higher wages that would attract and retain bargaining unit workers, the bargaining unit is being, and will be, deprived of such higher wages for the work performed until arbitration – in addition to income for any additional hours of work that bargaining unit employees would have performed if Defendant were not employing third parties to do this work instead. Any backpay award issued by an arbitrator would at best only make the bargaining unit impartially whole if Defendant's conduct continues.

As the Fifth Circuit has stated in affirming the issuance of a *Boys Market* injunction, "[t]he availability and adequacy of money damages, of course, has always been an important consideration in evaluating irreparable injury." *Jacksonville Mar. Ass'n v. Longshoremen's Association*, 571 F.2d 319, 325 (5th Cir. 1978). The issue in this case was that the union was sending employees for work in excess of the numbers requested by employers. *Id.* The union argued there was no irreparable injury to the employers in maintaining and paying these additional workers because the union would reimburse the excess wages the employers paid if so

15

ordered in arbitration. *Id.* The Court rejected this argument, finding the potential damages too speculative because the employers had no control over the number of excess employees sent for work and could not know whether they could actually afford all such employees. *Id.* The potential damages here are likewise too speculative to ensure an adequate remedy at a future arbitration if the conduct is not enjoined in the present.

The high turnover among employees in the retail grocery industry compounds the inability to fully compensate the bargaining unit with a delayed backpay award. It will be difficult, if not impossible, to identify and compensate bargaining unit members who lost work (and to calculate the wage rate Defendant would have paid if it were not using third party contracted employees to avoid paying its committed employees higher wages commensurate with market pressures). This challenge is then further exacerbated by Defendant's refusal to respond to or even acknowledge Plaintiff's requests for documentation necessary to processing the grievances filed concerning Defendant's violative conduct described herein. Although Plaintiff hopes to secure this documentation through its charge currently pending before the National Labor Relations Board, at present, Plaintiff lacks information to adequately track the scope of the harm inflicted on bargaining unit.

In addition to being speculative, the extent of damages (hours worked and rate of pay) will thus be difficult for the Union to establish, creating the risk that an arbitrator would find Defendant violated the contract but award no monetary damages. *Cf. Georgia-Pacific Corp.* 106 BNA LA 980 (Moore, 1996). And even if Defendant provides the Union evidence of the hours worked by non-bargaining unit employees, the Union will still be unable to establish its true damages with certainty since Defendant will not negotiate wage rates for bargaining unit

employees while enabled to replace such workers with third parties. Even totaling the bargaining

unit hours taken will fail to account for true lost wages incurred by the bargaining unit.

Finally, the Defendant's conduct suggests it will continue its course of violative conduct

in a manner that will impede the Union's ability to identify and thwart such violations, causing

increased irreparable harm. Under such circumstances, an injunction is warranted. The Tenth

Circuit refused to reverse an injunction issued against a union based on repeated, isolated

instances of violative conduct. The Court cited the union's "unlawful proclivity . . . to pursue a

course of conduct in violation of the agreement of the parties" and found that based on "this

repeated pattern of conduct" that "repetition seem[ed] likely." *CF&I Steel Corp. v. Mine*

*Workers*, 507 F.2d 170, 176-77 (10th Cir. 1974). Defendant here has likewise demonstrated no

intent to cease its behavior.

Since first learning of Defendant's violative conduct, the Union continues to learn of

additional incidents at a number of Defendant's stores. The violations vary in the persons

performing the work, *compare* Kehm Declaration at ¶ 5-12;  *with*  Streifel Declaration at ¶ 4-6,

as well as by location. *Compare* Kehm Declaration at ¶ 4 *with* Streifel Declaration at ¶ 4. As

such, Defendant has made clear that it has no intent to cease this behavior, and has in fact refused

the Union's multiple requests to commit to cease and desist in writing. *See* Cordova Declaration

at ¶ 14. Even if Defendant stops using third parties at one store after being confronted with

irrefutable evidence of the violation from Plaintiff, Defendant proceeds to use the third parties at

another store. With approximately one-hundred stores in the state, Defendant can evade

detection, leaving Plaintiff to play catch up and unable to prevent or ascertain the scope of the violations.[5]

## IV. The Balances of Hardships Weighs in Favor of Plaintiff

The balance of hardship analysis mirrors that used outside of the labor context. *Dillon Co.*, 2009 BL 138962, at *10. Courts in this Circuit look at the relative threats of harm or injury to the parties. *Id.* Here, there is no harm to Defendant should the Court award the injunction sought herein as the injunction would only require Defendant to follow the contract pending arbitration, which it should do as a matter of course. Defendants' operations will not be impacted because the work will get done. Bargaining unit workers can perform the work that is rightfully theirs, and if more workers are needed to complete the work, Defendant can hire more bargaining unit workers to perform such work. By using bargaining unit workers, Defendant will have the benefit of more consistent, experienced, and dedicated workers.

In contrast, the bargaining unit is suffering a loss of work (and accordingly, income and health and pension contributions) when Defendant hires and pays third parties to perform bargaining unit work instead. The work cannot be recreated and done later if an arbitrator finds in favor of Plaintiff, and quantifying the extent of the harm will be challenging such that the bargaining unit may never be made whole (*see supra*).

---

[5] This is also compounded by the nature of the retail grocery industry, which, as articulated above, experiences high employee turnover, and which requires third parties and vendors to *permissibly* traverse the stores on a daily basis to do *certain permitted* tasks. It is difficult for store employees and Union representatives to become familiar with all individuals and entities involved in the day-to-day store operations, and thus identify all violative work. Additionally, although the stores may close overnight, crews continue to work in the stores – including some bargaining unit employees and third-party vendors. These overnight shifts provide increased opportunity for Defendant to surreptitiously permit third parties to perform bargaining unit work, which will be difficult to detect and track to ensure the bargaining unit is adequately compensated at arbitration. *See* Cordova Declaration at ¶¶ 26-27.

That Defendant may need to pay more money to use bargaining unit workers to do the work does not alter this analysis – indeed, it only substantiates the extent of the harm to the bargaining unit if members are prevented from doing their work themselves.

## V.    Plaintiff is Likely to Succeed on the Merits

In *Amoco*, the Tenth Circuit adopted the modified standard for "success on the merits" first articulated by the Ninth Circuit, which requires the party "seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Markets*" to "establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." 885 F.2d at 703-04. By imposing a less stringent standard than that followed in traditional requests injunctive relief, courts recognize the need to leave any inquiry into the merits to the arbitrator. *Id*. at 703.

Thus, as in *Amoco*, the Union can meet this factor by pointing to a colorable basis in the CBAs for its complaint and request for injunction. As detailed above, the parties CBAs expressly outline the scope of bargaining unit work and limitations on vendor or other non-bargaining unit work in the stores. *See supra*. Under these provisions, the stocking of most merchandise is a task traditionally reserved for the bargaining unit. *See* Exhibit 1 at Art. 2; Exhibit 2 at Art. 2; Cordova Declaration at ¶¶ 5-6; Kehm Declaration at ¶ 10. The CBAs include only limited enumerated exceptions to this exclusively bargaining-unit work, namely store management, sanitation and floor maintenance, and direct store vendors. The conduct alleged herein – third party employees who are neither store management nor employees of direct store vendors stocking shelves (not sanitation or maintenance work) – clearly falls outside of these limited exceptions. Thus, not only will arbitration not be a "futile endeavor" – but Plaintiff is likely to success on the merits.

Defendant's lackluster attempts to defend its blatant violations to date have only underscored the soundness of proceeding to arbitration concerning Plaintiff's allegations. Defendant has thus far offered conflicting, and shifting explanations for its conduct. *See supra*. Indeed, Defendant's attorney attempted to justify the conduct based on an exception that is *not contained* in the CBAs – while plainly not denying facts underlying Plaintiff's Complaint. *See* Exhibit 10.

## VI.    The Injunction is in The Public Interest

Although the Tenth Circuit excluded public interest findings from the "traditional" equitable principles requiring analysis in issuing a preliminary injunction, it nonetheless cited the "peaceful resolution of labor disputes through voluntary arbitration" as an "important" policy consideration. *Amoco*, 885 F.2d at 709 n.18. Enjoining the Defendant here from using third parties to do bargaining unit work will likewise promote peaceful resolution of the parties' dispute through the arbitration process. The Defendant's interests will not be impaired by such an injunction because, as articulated *supra*, it can continue all operations by using bargaining unit personnel. The continued operations of Defendant's stores is also in the public interest, as the stores provide essential services to the communities, including food, prepared meals, pharmaceuticals, and hygiene merchandise.

As outlined in the foregoing, all of these factors weigh in favor of Plaintiff, and therefore, Defendant must be enjoined pending arbitration to maintain the status quo.

## <u>CONCLUSION</u>

Local 7 is entitled to the benefit of the bargain it struck with King Soopers, including the bargaining unit work protections workers fought for at the bargaining table. Absent an

injunction, Plaintiff will suffer irreparable harm and be unable to recover the full scope of its

losses at any eventual arbitration(s) over these matters. For the foregoing reasons, Plaintiff Local

7 respectfully requests that the Court set an evidentiary hearing on the foregoing Motion for

Preliminary Injunction, grant its Motion for Preliminary Injunction, and issue an order enjoining

the Defendant from subcontracting bargaining unit work with third-party staffing services such

as Day Ready/People Ready and Retail Odyssey from having non-bargaining unit employee

perform bargaining unit work.


Dated this 28th day of December, 2021.


_____
Mathew S. Shechter
*General Counsel*
Samantha L. Palladino
*Associate General Counsel*
UNITED FOOD & COMMERCIAL
WORKERS LOCAL 7
7760 West 38th Avenue, Suite 400
Wheat Ridge, CO 80033

*Attorneys for Plaintiff*